Tuan Hai Dang
3674 Rose Terrasse Circle
San Jose, California [95148]
Telephone: 408-394-4873
Facsimile: 408-223-1539
haidangng009@gmail.com

**FILED**
AUG 2 4 2010
CLERK
United States Bankruptcy Court
San Jose, California

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CALIFORNIA

**Tuan Hai Dang**
CHAPTER 13,

Plaintiff-Debtor

Vs.

**HSBC BANK**, AS TRUSTEE IN TRUST FOR **SEQMT 2007-3**,

Claimant

Bankruptcy Case No. 10-57266

OPPOSITION
TO
CREDITOR'S CLAIM AND
OPPOSITION TO RELIEF
FROM STAY

Assigned to Honorable
Arthur Weissbrodt

HEARING REQUESTED)

---

COMES NOW debtor **Tuan Hai Dang**, respectfully alleging the following in his OPPOSITION TO CLAIM AND OPPOSITION TO RELIEF FROM STAY against **HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3** to whit:

JURISDICTION. VENUE. PARTIES

Tuan Hai Dang Domiciled on the land near 493 Verano Court, San Jose community, California states:

1. Debtor is an individual, and debtor of the within-captioned bankruptcy case, under Chapter 13 of the Bankruptcy Code. Plaintiffs-Debtor's address is 493 Verano Court, San Jose, California.

1

2. Claimant **HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3** is the alleged holder of the rights to contract in this disputed claim.

### 3. GENERAL ALLEGATIONS

HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3's MOTION FOR RELIEF FROM AUTOMATIC STAY as the Court may read is predicated almost entirely on their right to appear here as a creditor and legal holders of the rights of contract to Debtor's mortgage. But Debtor disputes the claim of HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3, as having right to appear here as a creditor and legal holders of the rights of contract to Debtor's mortgage.

4. On May 9, 2007 Debtor refinanced the property near 493 Verano Court, San Jose community, California.

5. . Claimant asserted a claim against Debtor and further asserted that said claim is secured by a lien against said property. A copy of said property of claim is attached hereto as Exhibit DT.

6. Claimant has failed to provide original and subsequent documentation to show that they are the proper holders of a mortgage on said property pursuant to applicable laws.

7. Without proper documentation, Claimant's claim must be expunged since there is no proof to establish Claimant's lien.

### LACK OF STANDING

**Whether any parties for whom Claimant, herein after "Defendant", is acting is holder in due course of the original, unconverted, debt instruments who would have personal jurisdiction and standing as legal holders of the debt to have claim brought in their own name** even if the debt were deemed to be valid, or whether such note/contract between First Magnus Financial Corporation and Debtor survives today has not been established by the defendant **by affidavit or other competent fact witness.**

HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3Trust is a statutory trust under New York Statutory law which, according to its prospectus as found on the Securities and Exchange Commission web site

2

http://www.secinfo.com/dsvRa.z2nw.htm, is **a specifically created investment vehicle that issues securities "backed" or supported by mortgage financial assets.**

I.

**HSBC BANK USA AS TRUSTEE IN TRUST FOR SEQMT 2007-3** actions to enforce this loan contract that is the subject of this dispute against Debtor is an and illegal act by FRAUDULENT MISREPRESENTATION AS TO ENFORCE RIGHTS OF CONTRACT jeopardizing the title and possession of the Debtor to his property that is the subject of this dispute in that the Defendant lacks **JURISDICTION AND STANDING TO ENFORCE THE RIGHTS OF CONTRACT in this case.**

**HSBC BANK USA AS TRUSTEE IN TRUST FOR SEQMT 2007-** is identified in the Motion for Relief from Stay and other official documents as actual holder of the loan contract at the time of, and with the power to exercise foreclosure in its name in this contract that led to its ownership of the property.

Reports of the Securities and Exchange Commission on official Securities and Exchange Commission website **http://www.secinfo.com/d1Z7kr.v46t.htm** shows the **State of New York is the state of its creation under the law.**

Debtor has received official documentation from the Secretary of State of New York showing that no corporation, trust, or other legal entity by either of those or any similar name exists or has been chartered, incorporated or otherwise legally created in the State of New York for which a Trustee may be acting. This documentation by these authorities will be provided to the Court at time of hearing.

**On these grounds Defendant moves for immediate denial of relief from stay. A trustee cannot act for a phantom party in interest that does not legally exist to be an in personum holder of these debt instruments or the holder of real property and the claim must be voided.**

Pursuant to the Uniform Commercial Code and California law, any legally recognized "person" can be a holder in due course of such debt instruments or of real property in California.

UCC 1-201 and California **Code 1201 "Holder"** means: (A) the <u>person</u> in possession of a negotiable instrument that is payable either to <u>bearer</u> or to an identified person that is the person in possession; or (B) the person in possession of a <u>document of title</u> if the goods are deliverable either to bearer or to the order of the person in possession.

3

A "person" is defined there as: UCC 1-201 and California **Code1201, "Person"** means an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision, agency, or instrumentality, public corporation, or any other legal or commercial entity.

The assignment or sale of the debt instruments and of the subject property to such an entity that does not exist possessing legal personhood under the laws of some state or the federal government to own such instruments and to have become legal owner of the property in question is invalid and therefore can convey no rights of property, title or possession of the debt instruments prior to sale or of the subject property after the sale to support any action by a trustee in its behalf under the laws of California.

On these grounds Defendant moves for voiding of claim, voiding of the title to the property subsequent to the sale and of Claimant's claim to right of possession by this unlawful detainer action as the fiduciaries for the true holder cannot act for a phantom party in interest that does not legally exist to be an in personum holder of these debt instruments or of the subject property to give either party standing and personal jurisdiction of legal parties in interest to have enforced the claims and rights of the contract or to have become the owner of the property under the laws of California.

Pursuant to UCC **3-302**, and California Code 3302 absent being holder in due course of the Debt Instruments, **defendant lacks STANDING TO ENFORCE THE RIGHTS OF CONTRACT in this case** or to have become owner of the property at sale and foreclosure against Plaintiff's property by and its purchase by claimant was a fraudulent and illegal act jeopardizing the title and possession of the Plaintiff to his property that is the subject of this dispute and the sale should be voided and Plaintiff should be enjoined from such action.

**On these grounds Plaintiff moves for voiding of the claim as the fiduciaries for the true holder cannot act for a phantom party in interest that does not legally exist to be an in personum holder of these debt instruments or of the property in dispute to give either party standing and personal jurisdiction of legal parties in interest to enforce the claims in this bankruptcy.**

II.

Further, Plantiff has new knowledge that will prove to the Court the assignment of the deed of trust, under which foreclosure, the Deefendant, **HSBC BANK USA acting in behalf of the holder of the loan, AS TRUSTEE IN TRUST FOR SEQMT 2007-3**, gained title to the subject

4

property was invalid or fraudulent voiding the title of the plaintiff to bring this current action and it should be dismissed.

Attached is a Memorandum of law of the United States Trustee in support of sanctions against JP Morgan Chase Bank, National Association. This Memorandum is a brief concerning a bankruptcy case that involved Chase, Long Beach Mortgage, Long Beach Mortgage Loan Trust 2006-2, Long Beach securities, WaMu, Deutsche Bank and Lender Processing Service (LPS) (exhibit MS) . In further support there is submitted articles from publication in Fraud Digest by competent authorities in the field of bank fraud (exhibit FD).

And a redacted affidavit from one of the cases referenced (exhibit AR).

According to the authorities therein cited in the affidavit and memoranda, In tens of thousands of foreclosure cases filed by trustees for a mortgage-backed trust, the trustee for the Asset Trust has used specially prepared Mortgage Assignments to show that they have the right to foreclose.

These documented authorities spell out in the cases referenced the same thing, the facts, show to have happened in this case: According to Lynn E. Szymoniak, Certified Fraud Examiner and Expert Witness for the federal Government in Insurance Regulatory and Fraud Matters in the action for sanctions in the cases referenced and in U.S. v. Michael Zapetis, et al. 8:2006cr00026, Middle District of Florida; U.S. v. Thomas D. King, 3:2006cr00212, Middle District of Florida; U.S. v. Donald E. Touchet, Richard E. Standridge and Robert J. Jennings, 3:2007cr00090, Middle District of Florida, 2008 WL 111306M; affirmed, United States v. Jennings, Case No. 08-13434 (11th Cir. Jan. 5, 2010) The People of the State of California v. Mitchell Zogob, Orange County, California; U.S. v. James Kernan, 5:2008cr00061, Northern District of New York; if a loan was put into a trust with a closing date in the pooling and servicing agreement in 2006, ( in this case July 27, 2007 according to the Trust's Prospectus here in cited ) or if the trust indentures show that it was suppose to be put in that trust and follow a chain of ownership until it ended up in that trust by a certain date by a certain date according to the trust's Prospectus her in cited http://www.secinfo.com/d12TC3.u1273.htm (closing date of the trust July 27, 2007) any assignment after that closing date it is actually an Assignment specially, and in many cases, fraudulently, made to facilitate foreclosures.

As she states, In all of these thousands of cases, no Assignment actually took place on the date stated and no consideration was paid by the grantee to the grantor despite the representations in the Assignments. Most significantly, no disclosure was ever made to the Court in the

5

foreclosure or bankruptcy case or to the homeowners in default that the original Assignments to the Trust were never made or were defective and that the recently-filed Assignments were **specially made to facilitate foreclosures years after the property was already transferred if in fact it had been.**

As she states in these articles, In the rush to securitize residential mortgages, many securities companies did not secure the essential paperwork. In particular, many trusts have missing Mortgage Assignments. This is true even though the trust documents set forth plainly that such Assignments shall have been delivered to the Trust by the loan originators by a set closing date.

According to these authorities, (the originator) should have delivered a signed and dated Assignment to the Trust Depositor, which ultimately should have resulted in delivery of a signed and dated Assignment to the trustee, **in 2007**.

According to these authorities, and as may be found in the prospectus and other official governing documents for these investment vehicles, upon examination, such Mortgage-backed trust contains very specific provisions regarding conveyances of mortgages, notes and Assignments and most often even include the form that each document custodian must sign attesting to the delivery and acceptance of such documents.

**Further, according to these authorities herein cited, Mortgage-backed trusts are not allowed under their own rules to acquire non-performing loans after the closing date of the trust and add such loans to the trust because of significant additional tax liability to the trust if it adds properties in violation of its own documents. These rules are in place to protect the investors in the trust.**

In addition, Mortgage Backed Securities Trusts do not acquire loans after the closing date of the trust because **they are prohibited from doing so under the Internal Revenue Code**, as evidenced by a 100% penalty tax on such prohibited transactions.

According to these authorities and as confirmed under the very strict rules of its operation to protect the investors as found in the prospectus and other official governing documents for this investment vehicle, ( as found on the self authenticating official Securities and Exchange Commission website, http://www.secinfo.com/d12TC3.u1273.htm , where either the Mortgage Backed Securities Trust lacked title to the mortgage, **or shows assignment to it after the start-up period,** the REMIC requirements for a static pool of qualified mortgages were breached. The notes were not "qualified mortgages" under IRC §860G and the Mortgage

6

Backed Securities Trust received income from borrowers NOT attributable to a qualified mortgage or permitted investment. And under IRC §860F, the Mortgage Backed Securities Trust will owe **a 100% penalty tax.** Pursuant to IRC §860G, all assignments to the Mortgage Backed Securities Trust after the REMIC start-up period are subject to a 100% penalty tax.
Further, pursuant to IRC§ 61, all the payments made from borrowers to the Mortgage Backed Securities Trust in relation to notes and mortgage loans not so protected by assignment to the Mortgage Backed Securities Trust **prior the REMIC start-up period** represent gross income and are subject to federal income taxes.

**Again, As a consequence, according to Ms. Szymoniak, if a loan was put into a trust with a closing date in the pooling and servicing agreement in 2007 or if the trust indentures show that it was suppose to be put in that trust and follow a chain of ownership until it ended up in that trust by a certain date (closing date of the trust), as maybe in the case of the assignment of this loan, any assignments after that closing date is actually an Assignment specially, or fraudulently made after the fact to legitimize a chain of title to facilitate foreclosure.**

As a consequence of these facts affirmed upon production before the Court and the debtor of the assignment of interests in the loan that resulted in foreclosure and alleged ownership of the property by the Claimant this will be prima facie evidence whether or not the **assignment to this present claimed holder of rights to this contract is invalid if not fraudulent or illegal. Or** that No Assignment actually took place on the date stated and no consideration was paid by the grantee to the grantor despite the representations in the Assignments.

Most significantly, no disclosure was ever made to the Court in the foreclosure or to the homeowners in default that the original Assignments to the Trust were never made or were defective and that the recently-filed Assignments were **specially made to facilitate foreclosures years after the fact.**

The record in this case shows exactly that. If the Debt instruments of this contract were not assigned to **HSBC BANKUSA acting in behalf of the holder of the loan, AS TRUSTEE IN TRUST FOR SEQMT 2007-3** by the then present holder, until after the closing date of **July 27, 2007** for the REMIC start-up period and of the Pooling and Servicing Agreement, **as confirmed in the prospectus for this investment vehicle.** Therefore, based on the documentation and expert testimony of these authorities in this and other cases herein cited, with the documents in

7

this case, **this will be prima facie evidence that the assignment of the mortgage in dispute to HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3 is shown to be invalid, if not illegal or fraudulent** voiding the standing of HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3 to have brought the foreclosure action upon which it claims rights to possession in this case as the assignment was made solely to facilitate foreclosure and proves no ownership of borrower's loan whatever on which its foreclosure and claims to possession rests and on this basis this claim should be dismissed.

**And pursuant to these facts** Debtor demands the right to have produced for the Court the original **Mortgage and Promissory Note for examination by the Debtor and the Court** for evidence of such **markings on it or an allonge attached or reduced to computer disc showing what exchange, sale or transfer of the loan has been made by one or more of the holders of these instruments since the making of the loan and who actually is now the present alleged legal and actual holder of this debt with standing to have foreclose performed in its name, AND the original or certified copy of the Assignment of Deed of Trust by which Claimant alleges to have come into ownership of the rights of the contract foreclosed under that allegedly led to their standing to seek this relief from stay.**

III.

Further, the assignment of the deed of trust to HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3, **upon best belief and knowledge,** was made by MERS; **Mortgage Electronic Registration Systems, Inc.** The beneficiary under the Deed of Trus, see exhibit DT attached, **There is no evidence that ownership of the note was transferred** by this assignment. And there has been no other testimony or evidence submitted by the Claimant at anytime before or after foreclosure to support such change of ownership to the note.

**Mortgage Electronic Registration Systems, Inc. is identified in Defendant's deed of trust, of record in this case as acting 'solely as nominee for the lender or their successors and**

8

**assigns'** acknowledging **they themselves were not and never would be a legal holder of the rights to this loan.**

The United States Bankruptcy Court for the Eastern District of California has issued a ruling dated May 20, 2010 in the matter of In Re: Walker, Case No. 10-21656-E-11 which found that MERS could not, as a matter of law, have transferred the note to Citibank from the original lender, Bayrock Mortgage Corp. The Court's opinion stating that MERS and Citibank are not the real parties in interest.

The court found that MERS acted "only as a nominee" for Bayrock under the Deed of Trust and **there was no evidence that the note was transferred**. The opinion also provides that "several courts have acknowledged that MERS is not the owner of the underlying note **and therefore could not transfer the note, the beneficial interest in the deed of trust, or foreclose on the property secured by the deed**", citing the well-known cases of In Re Vargas (California Bankruptcy Court), Landmark v. Kesler (Kansas decision as to lack of authority of MERS), LaSalle Bank v. Lamy (New York), and In Re Foreclosure Cases (the "Boyko" decision from Ohio Federal Court).

The opinion states:

> **"Since no evidence of MERS' ownership of the underlying note has been offered, and other courts have concluded that MERS does not own the underlying notes, this court is convinced that MERS had no interest it could transfer to Citibank. Since MERS did not own the underlying note, it could not transfer the beneficial interest of the Deed of Trust to another. Any attempt to transfer the beneficial interest of a trust deed without ownership of the underlying note is void under California law."**

This conclusion was based upon California law cited in the opinion that the note and the mortgage are inseparable, with the former being essential while the latter is "an incident", and that an assignment of the note carries the mortgage with it, "while an assignment of the latter [the mortgage] alone is a nullity."

Based on the determinations of that court, As MERS must own the note in order to assign the incident deed of trust; **MERS is legally precluded from assigning the deed of trust for want of ownership of the note, and cannot assign the note in any event as it never owned it.**

MERS' lack of ownership interest in promissory note is a matter of decided case law based on a record stipulation of MERS' own lawyers in the MERS v. Nebraska Dept. of Finance decision.

This California court made it a point to cite non-bankruptcy cases as to the lack of authority of MERS in its opinion. Further, this opinion is consistent with the prior rulings of the Idaho and Nevada Bankruptcy courts on the same issue, that being the lack of authority for MERS to transfer the note as it never owned it (and cannot, per **MERS' own contract** which provides that **MERS agrees not to assert any rights to mortgage loans or properties mortgaged thereby**).

Further, the Missouri Court of Appeals Eastern District in Bellistri v Ocwen March 3, 2009 has expressed an opinion that shows an assignment of a loan to a servicing company for collection can actually make the loan uncollectible from the mortgaged property.

MERS, Mortgage Electronic Registration Service, is the named mortgage holder in transactions having an aggregate dollar value in the hundreds of billions, and its service of providing a way to trace ownership of mortgages has played a large role in the securitization of mortgages and the marketability of derivative mortgage-backed securities.

Bellistri obtained a deed from the Jefferson County (Mo.) collector. A suit to cure the potential defects, a "quiet title suit" was required to make title good, so that the property could be conveyed by warranty deed and title insurance issued to new lenders and owners. The plaintiff in a quiet title suit is required to give notice of the suit to all parties who had an interest in the property identified in the collector's deed.

A borrower named Crouther had obtained a loan from BCN Mortgage. The mortgage document named MERS as the holder of the deed of trust as BCN's nominee though the promissory note secured by the deed of trust was payable to the lender and didn't mention MERS, as in the present dispute. Meanwhile, MERS assigned the promissory note and deed of trust to Ocwen Servicing.

Bellistri filed a suit for quiet title and to terminate any right of Crouther to possess the property. After discovering the assignment of the deed of trust to Ocwen, Bellistri added Ocwen as a party to the quiet title suit, so that Ocwen could have an opportunity to prove that it had an interest in the property, or be forever silenced.

Bellistri's attorney argued that Ocwen had no interest in the property, because the deed of trust that it got from MERS could not be foreclosed.

> The decision states, "When it assigned the deed of trust. MERS attempted to transfer to Ocwen the deed of trust "together with any and all notes and obligations therein described or referred to, the debt respectively secured thereby and all sums of money due and to become due."
>
> The record reflects that BNC was the holder of the promissory note. There is no evidence in the record or the pleadings that MERS held the promissory note or that BNC gave MERS the authority to transfer the promissory note. MERS could not transfer the promissory note; therefore the language in the assignment of the deed of trust purporting to transfer the promissory note is ineffective. Black v. Adrian, 80 S.W.3d 909, 914-15 (Mo. App. S.D. 2002) ("[A]ssignee of a deed of trust or a promissory note is vested with all interests, rights and powers possessed by the assignor in the mortgaged property"). MERS never held the promissory note, thus its assignment of the deed of trust to Ocwen separate from the note had no force. See George, 76 S.W.2d at 371. St. Louis Mid. Life Ins. Co., 46 S.W.2d at 170.
>
> As Ocwen holds neither the promissory note, nor the deed of trust, Ocwen lacks a legally cognizable interest and lacks standing to seek relief from the trial court. See Scott, 235 S.W.2d at 374. The trial court was without jurisdiction to grant Ocwen its requested relief, and did not err in granting summary judgment in Bellistri's favor.
>
> **As a matter of law, the right to foreclose goes away when the promissory note is "split" from the deed of trust that it is supposed to secure. The note that Crouther signed and gave to BNC didn't mention MERS, so MERS had no right to assign the note to Ocwen. The assignment that MERS made to Ocwen conveyed only the deed of trust, splitting it from the note.".**

These opinion thus serve as a legal basis by which Debtor here challenges the standing of the claimant to foreclosure of the subject property based on a MERS assignment and on this basis Defendant moves this claim be dismissed.

**And again, pursuant to these facts** Debtor demands the right to have produced for the Court the original **or certified copy of the Assignment of Deed of Trust by**

11

which Claimant alleges to have come into ownership of the rights of the contract foreclosed under that allegedly led to their standing to seek this relief from stay.

**Premises considered, Plaintiff prays the Court to deny this motion for Relief from Stay until it determines finally the status of** HSBC BANK ACTING IN BEHALF OF THE HOLDER OF THE LOAN, AS TRUSTEE IN TRUST FOR SEQMT 2007-3 **as a party in interest with rights to make motions and claims before the Court affecting this bankruptcy and with the right to seek anything from this honorable Court.**

IV.

<u>LACK OF PROOF OF PERFECTED TITLE</u>

**Further there is an Insufficiency of the evidence of title to justify granting of Relief from Stay based on a claim of ownership of the property.**

There is in fact a controversy over title in the public records. RESCISSION OF TRUSTEE'S DEED was recorded : 04/21/2010 and a FULL RECONVEYANCE to Debtor was recorder 05/15/2009 as a matter of public record. These actions and conveyences were not disputed or challenged by the Claimant in state court and therefore they stand as the official status of the property as to title.

This is attested to by a duly qualified title search performed by Fidelity National Title Insurance at the behest of Debtor May 24, 2010, herein attached as exhibit T, and showing Debtor , not the Claimant, to be the current recorded owner of the property negating the standing of Claimant to have brought this action and this action against Debtor's property should be dismissed on this ground .

FIRST CLAIM FOR RELIEF

Declaratory Relief to Determine an Interest in Property

Federal Rules of Bankruptcy Procedure 7001 (2') and 7001 (9')

8. Debtor denies said claim made by Claimant in this bankruptcy proceeding.

9. An actual controversy exists between Claimant and Debtor with regard to the nature, extent and validity of Claimant's interest in said property.

10. It is necessary that this Court declare the actual rights and obligations of the parties and make a determination as to the nature, extent and validity of Claimant's interest in said property before it may honor any motions by Claimant in Debtor's bankruptcy.

## SECOND CLAIM FOR RELIEF
### EXPUNGEMENT OF Proof of Claim
### Federal Rules of Bankruptcy Procedure 7001(2) and 7001 (9)

11. Upon the determination by this Court as to the actual rights and obligations of the parties, Claimant's proof of claim must be expunged.

Wherefore, Debtor moves the court for the following relief:

12. That this Court determine the nature, extent and validity of Claimant's real interest in property at 493 Verano Court, San Jose community, California.

13. That this Court expunge Claimant's proof of claim in this bankruptcy proceeding and deny Claimant's motion for relief from stay.

14. For such other and further relief that this Court deems just and proper.

Respectfully submitted,

Dated: Aug 24, 2010

_/s/ Tuan Hai Dang_
Tuan Hai Dang
Plaintiff-Debtor
Tuan Hai Dang
c/o 493 Verano Court
San Jose, California [95111]

13

DOCUMENT: 19440565

Pages: 23
Fees 75 00
Taxes
Copies..
AMT PAID 75 00

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Commonwealth Land Title

RDE # 012
5/22/2007
1:16 PM

Recording Requested By:
FIRST MAGNUS FINANCIAL CORPORATION

Return To:
FIRST MAGNUS FINANCIAL CORPORATION

603 N. WILMOT
TUCSON, AZ 85711
Prepared By:
FIRST MAGNUS FINANCIAL CORPORATION
603 N. WILMOT
TUCSON, AZ 85711

CLTC 67220380 ——[Space Above This Line For Recording Data]——

# DEED OF TRUST

LOAN NO.: 8682811455
ESCROW NO.: 67220380

MIN 1000392868828114551
MERS Phone: 1-888-679-6377

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    MAY 09, 2007
together with all Riders to this document.
(B) "Borrower" is
TUAN HAI DANG AN UNMARRIED MAN

Borrower's address is 493 VERANO COURT, SAN JOSE, CA 95111
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

Lender is a   CORPORATION
organized and existing under the laws of   ARIZONA

Initials: HD

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3005 1/01
V-6A(CA) (0207) 01            Page 1 of 15      LENDER SUPPORT SYSTEMS, INC MERS6ACA.NEW (05/06)

EXHIBIT "DT"

Lender's address is
603 NORTH WILMOT ROAD, TUCSON, AZ 85711
(D) "Trustee" is
LANDAMERICA COMMONWEALTH
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated     MAY 09, 2007
The Note states that Borrower owes Lender

FIVE HUNDRED TWENTY EIGHT THOUSAND AND NO/100 X X X X X X X X X X X X X X X X X X X
Dollars
(U.S. $ 528,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    JUNE 01, 2037
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "RIDERS" means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by Borrower [check box as applicable]:

[XX] Adjustable Rate Rider       [ ] Condominium Rider                [ ] 1-4 Family Rider
[ ] Graduated Payment Rider      [XX] Planned Unit Development Rider  [ ] Biweekly Payment Rider
[ ] Balloon Rider                [ ] Rate Improvement Rider           [ ] Second Home Rider
[ ] Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _HO_

V-6A(CA) (0207).01        Page 2 of 15        Form 3005 1/01

Case: 10-57266   Doc# 24   Filed: 08/24/10   Entered: 08/25/10 13:30:15   Page 15 of 20

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY of SANTA CLARA :
[Type of Recording Jurisdiction]  [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF ......AND BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 684-22-026 which currently has the address of
493 VERANO COURT [Street]
SAN JOSE [City], California 95111 [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

Initials: _HO_

V-6A(CA) (0207).01  Page 3 of 15  Form 3005 1/01

Case: 10-57266   Doc# 24   Filed: 08/24/10   Entered: 08/25/10 13:30:15   Page 16 of 20

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Case: 10-57266   Doc# 24   Filed: 08/24/10   Entered: 08/25/10 13:30:15   Page 17 of 20

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Case: 10-57266   Doc# 24   Filed: 08/24/10   Entered: 08/25/10 13:30:15   Page 18 of 20

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable